### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

NIEVE DE LOS ÁNGELES VÁZQUEZ
LAZO,

      **Plaintiff,**

        **v.**                                **CIVIL NO. 15-1891 (PAD)**

UROYOÁN RAMÓN EMETERIO
WALKER; <u>ET AL.</u>,

      **Defendants.**

### OPINION AND ORDER

Delgado-Hernández, District Judge

      Plaintiff Nieve de los Ángeles Vázquez Lazo is a Professor in the Humanities Department of the Bayamón Campus ("UPRB") of the University of Puerto Rico ("UPR" or "University"). Dissatisfied with various aspects of her job, she sued the UPR, its President and Board of Trustees, UPRB and UPRB personnel in their personal and official capacities over events related to, *inter alia*, academic assignments, performance, evaluations, probationary status, and tenure (Docket No. 8). To that effect, plaintiff essentially alleges that, as to those and other facets of her employment, defendants: (1) discriminated against and subjected her to a hostile work environment; (2) retaliated against her for complaining to her employer and the Civil Rights Commission of Puerto Rico about unlawful employment practices and speaking to the Press as a citizen in connection with a matter of public concern about the status of online courses at UPRB; and (3) terminated her probationary appointment without due process of law (Docket No. 8).

      Along the same line, plaintiff seeks declaratory, injunctive, and monetary relief under different provisions of Federal and Puerto Rico law, including Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 1981a, 1983, 1985(3), 1986 and 1988; the First, Ninth and Fourteenth Amendments of the Constitution of the United States (U.S. Const. amends. I, IX and XIV); Article II, Sections 1, 4, 7, 8 and 16 of the Constitution of Puerto Rico (P.R. Const., arts. II, §§ 1, 4, 7, 8 and 16); and Puerto Rico Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194 et. seq. (Docket Nos. 8, ¶ 1.2; 34, p. 4). Defendants deny liability (Docket Nos. 64; 81-82).

Following discovery, all parties moved for summary judgment (Docket Nos. 98; 102). On March 31, 2019, the court granted defendants' motion and denied plaintiff's motion (Docket No. 155). Preparing the corresponding Opinion and Order, however, the court *sua sponte* decided to revisit the record in its entirety. The review was extensive, taking longer than anticipated (Docket Nos. 155; 159). Nonetheless, it persuaded the court that its initial rulings were correct. To this end, as explained below, the due process claims lack merit; res judicata bars the retaliation claims; and the required predicates to access remedies under 42 U.S.C. §§ 1981a, 1985(3), 1986 and 1988 are missing in this case. Accordingly, the case must be, and is hereby DISMISSED.

## I.    PROCEDURAL BACKGROUND

On July 3, 2015, plaintiff initiated the action (Docket No. 1). On October 18, 2015, she filed an amended complaint (Docket No. 8). On January 4, 2016, defendants in their official capacity moved to dismiss the operative complaint (Docket No. 26). On May 3, 2016, they did so in their personal capacity (Docket No. 44). On April 15, 2016, and June 29, 2016, plaintiff opposed defendants' motions (Docket Nos. 34; 56). On May 13, 2016, defendants replied to plaintiff's opposition to the first motion to dismiss (Docket No. 42). On June 3, 2016, plaintiff sur-replied (Docket No. 52).

On September 30, 2016, the court granted in part the motion filed in defendants' official capacity (Docket No. 58), dismissing plaintiff's Ninth Amendment and Title VII claims. Id. On

<u>Vázquez Lazo</u> v. <u>Walker; et al.</u>
Civil No. 15-1891 (PAD)
Opinion and Order
Page 3

January 5, 2017, it entered a similar ruling with respect to the motion that defendants filed in their individual capacity (Docket No. 80). Meanwhile, on October 28, 2016, plaintiff moved for reconsideration of the official capacity-related ruling (Docket No. 60), which defendants opposed (Docket No. 70). Plaintiff replied (Docket No. 76). On December 27, 2016, the court denied the motion for reconsideration (Docket No. 78). With the dismissal requests disposed of, defendants answered the operative complaint denying liability (Docket Nos. 64; 81-82). After discovery, on April 27, 2018, and May 1, 2018, the parties moved for summary judgment (Docket Nos. 98; 102). Subsequently, they opposed each other's motions, replied, and sur-replied.[1] On February 7, 2020, and December 13 and 2022, they supplemented their briefs (Docket Nos. 165, 166, 185; 187). Following are the grounds for the court's decision.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party. <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. <u>Calero-Cerezo</u> v. <u>U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004). A genuine issue of material fact must be built on "a

---

[1] <u>See</u>, Docket No. 110 (Defendants' "Opposition to Plaintiff's Motion for Partial Summary Judgment on Procedural and Substantive Due Process claims"); Docket No. 119 (Plaintiff's "Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment"); Docket No. 125 (Defendants' "Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment"); Docket No. 130 (Plaintiff's "Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment on Procedural and Substantive Due Process Cause of Action"); Docket No. 141 (Plaintiff's "Sur Reply to Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment"); and Docket No. 143 (Defendants' "Sur-Reply to Plaintiff's Reply to Defendants' Opposition to Motion for Partial Summary Judgment on Procedural and Substantive Due Process Claims").

Vázquez Lazo v. Walker; et al.
Civil No. 15-1891 (PAD)
Opinion and Order
Page 4

solid foundation," constructed from materials of evidentiary quality. García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014).

Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative "will not suffice to ward off a properly supported motion for summary judgment." Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013). To resist summary judgment, the nonmovant must do more than show some metaphysical doubt as to a material fact. Matsushita Elec. Inds. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As to issues on which the nonmovant has the burden of proof, the movant needs to no more than "aver absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325; Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995). All reasonable factual inferences "must be drawn" in favor of the party against whom summary judgment is sought. Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013).

Cross-motions for summary judgment "do not alter the summary judgment standard," but instead simply require the court to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. Wells Real Estate v. Chardon/Hato Rey P'ship S. E., 615 F.3d 45, 51 (1st Cir. 2001). Although each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum. Id. Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the court ordinarily should consider the two motions at the same time, applying the same standards to each motion. Id. Based on these parameters, careful record review shows absence of genuine factual dispute as to the facts identified in the section that follows.

## III.    FINDINGS OF FACT[2]

### A. Employment

On January 19, 2006, plaintiff began working at UPRB as an Assistant Professor of Humanities under a one-year temporary contract.  See, Defendants' "Statement of Uncontested Material Facts" ("DSUMF") (Docket No. 102-1, ¶¶ 2, 3); plaintiff's "Opposition to Statement of Uncontested Material Facts" ("POSUMF") (Docket No. 120, ¶ 2, 3).  In 2008, she began to coordinate UPRB's Distant Learning Project, which offers online courses in several concentrations –including humanities, which plaintiff designed and taught– for students from the UPRB, other University of Puerto Rico campuses, and the U.S. Army.  See, Plaintiff's "Statement of Uncontested Material Facts" ("PSUMF") (Docket No. 97, ¶¶ 6, 8); "Defendants' Opposition to Plaintiff's Statement of Uncontested Material Facts" ("DOSUMF") (Docket No. 110-1, ¶¶ 6, 8).[3]

On May 24, 2012, the Humanities Department Personnel Committee, which evaluated all professors of the Humanities Department, unanimously recommended to then Dean of Academic Affairs, Dr. Edna Miranda-Rodríguez, that the university offer plaintiff a probationary, tenure-track appointment (DSUMF(Docket No. 102-1), ¶ 7; POSUMF (Docket No. 120), ¶ 7).[4]  The

[2] Although the court reviewed every statement the parties submitted, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed. R. Civ. P. 56.

[3] Defendants qualified the statement in opposition as to the continuity of coordination, stating that, as plaintiff allegedly admitted at PSUMF (Docket No. 97), ¶ 16, Mr. Orlando Orengo was the Distant Learning Project coordinator for the academic year of 2013-2014.  See, DOSUMF (Docket No. 110-1), ¶ 6.  Plaintiff did not make an express admission but conceded that Mr. Orengo was the coordinator as of April 28, 2014.  See, PSUMF (Docket No. 97), ¶ 16; Docket No. 123-3.

[4] The members of the Humanities Department Personnel Committee were: (1) Dr. Elsa Gelpí; (2) Dr. Nora Rodríguez-Vallés; (3) Prof. Margarita Fernández-Zavala; (4) Prof. Heberto Ferrer; (5) Dr. Raquel Rosario; (6) Dr. Luis Pabón-Batlle; and (7) Dr. Josefa Santiago-Caraballo (DSUMF (Docket No. 102-1), ¶ 7; POSUMF (Docket No. 120), ¶ 7). At that time, Dr. Pabón-Batlle was Director of the Humanities Department (DSUMF (Docket No. 102-1), ¶ 9; POSUMF (Docket No. 120), ¶ 9).

Faculty Personnel Committee accepted the recommendation, and on August 20, 2012, Chancellor Dr. Arturo Avilés-González issued a letter offering plaintiff a probationary appointment as assistant professor, to be effective on that same date (DSUMF (Docket No. 102-1), ¶¶ 9-11; POSUMF (Docket No. 120), ¶¶ 9-11; Docket No. 138-1).[5]

On August 27, 2012, plaintiff sent a letter to Dr. Pabón-Batlle –following up on October 30, 2012 with another letter addressed to Dr. Avilés-González– through which she requested a promotion in rank (DSUMF (Docket No. 102-1) ¶¶ 13, 17; POSUMF (Docket No. 120), ¶¶ 13, 17).[6] Her request for a promotion in rank, as well as a separate request for tenure, were eventually referred to an *ad hoc* committee for evaluation (DSUMF (Docket No. 102-1), ¶¶ 22-25; POSUMF (Docket No. 120), ¶¶ 22-25). The requests, however, were referred back to the Humanities Department Personnel Committee for evaluation and recommendation (PSUMF (Docket No. 102-1), ¶¶ 13-14; DOSUMF (Docket No. 120), ¶¶ 13-14). On September 30, 2013, the Committee decided not to recommend plaintiff's requests. Id. On December 6, 2013, plaintiff appealed the

---

[5] Section 30.1.2 of the General Regulations of the University of Puerto Rico defined "probationary appointment" as having a "fixed term" during which "the incumbent will be under probation, subject to evaluation to determine if at the end of the same, they deserve to be retained with a permanent appointment" (PSUMF (Docket No. 97), ¶ 5; Docket No. 144-1, p. 1). Defendants oppose plaintiff's definition of "probationary appointment," but nevertheless refer the court to Section 30.1.2 for the proper definition (DOSUMF (Docket No. 110-1), ¶ 5). Because the court takes the definition from Section 30.1.2 itself, defendants' objection is moot.

[6] A few months later, on November 14, 2012, plaintiff filed an internal complaint in which she alleged workplace harassment and other grievances against Dr. Gelpí-Baíz in connection with certain events that took place after the August 27, 2012 letter (DSUMF (Docket No. 102-1), ¶ 21; POSUMF (Docket No. 120), ¶ 21; Docket No. 131-14). The complaint was referred to an examining officer, Jaime Rosa Malavé, for evaluation and recommendation (DSUMF (Docket No. 102-1), ¶ 23; POSUMF (Docket No. 120), ¶ 23). Although on May 9, 2013, that officer concluded that the alleged harassment occurred and recommended sanctions against Dr. Gelpí-Baíz, on September 20, 2013, interim Chancellor Orlando González-González did not adopt his recommendation (DSUMF (Docket No. 102-1), ¶¶ 29, 52; POSUMF (Docket No. 120), ¶ 29, 52). Plaintiff appealed to the President of the UPR, who denied the appeal by way of a resolution notified on June 27, 2014 (DSUMF (Docket No. 102-1), ¶ 53; POSUMF (Docket No. 120), ¶ 53). Plaintiff appealed before the University's Governing Board of the University, which denied it on March 21, 2016 (DSUMF (Docket No. 102-1), ¶ 54; POSUMF (Docket No. 120), ¶ 54).

determination as to tenure with the Governing Board, which denied it on June 26, 2014 (DSUMF (Docket No. 102-1), ¶ 55; POSUMF (Docket No. 120), ¶ 55).

## B. Online Courses

Meanwhile, on April 28, 2014, plaintiff sent to Dean Jorge F. Rovira a letter stating that she had been approached by certain students, who informed her that they had tried unsuccessfully to register online for online humanities courses; spoken with Prof. Fernández-Zavala regarding the issue; and Prof. Fernández-Zavala responded that "she did not believe in on-line courses" (PSUMF (Docket No. 97), ¶ 16). Plaintiff spoke with Mr. Orengo and Dr. Miguel Vélez, who confirmed that Prof. Fernández Zavala had ordered the closing of the humanities courses. Id.[7] Plaintiff's letter expressed that she had asked the Deputy Academic Dean and the Coordinator for Programs and Related Technology to be appointed as Academic Coordinator of the Distance Education Project, and two months later, Prof. Fernández-Zavala, suddenly and without written prior notice, stated that she did not believe in online courses, and eliminated all of the online courses that the Department of Humanities offered and on which plaintiff worked (Docket No. 123-2). The letter stated that since 2006, plaintiff had been investigating, designing, developing, and offering online courses in an uninterrupted way, and that her work had been used as a model for the development of other online courses. Id. Further, it stated that:

> [T]he cancellation, without prior notice to the members of the Department and without any consultation with any departmental committee, directly affect[ed] two professors who were responsible for designing and who [were] the ones offering the same: Nieve de los Ángeles Vázquez [plaintiff] and Aleida G. Gelpí. It is not possible to ignore the fact that there are two appeals for moral and psychological

---

[7] In a broad sweep, defendants deny these statements as inadmissible hearsay, because they are out-of-court statements by third parties offered for the truth of their content and are matters over which plaintiff has no personal knowledge (DOSUMF (Docket No. 110-1), ¶¶ 16-17). But in her affidavit, plaintiff has set the proper foundation for her knowledge of the statements contained in her letter of April 28, 2014. See, Docket Nos. 97-1, ¶ 16; 123-2.

harassment in the workplace against several departmental professors, including Professor Fernández, signed by these two professors (plaintiff and Gelpí). This is to mean that at time when the Legal Office of the [University of Puerto Rico] is settling a controversy on serious violations of civil and constitutional rights, suddenly Professor Fernández, one of the main defendants, unilaterally decides to cancel all courses, directly and irrevocably affecting the work program of each of the complainant professors in their individual capacity; the students; the Distance Learning Project of UPRB (which we have built with so much effort); the Department of Humanities; the entire academic community of UPRB, and of course, directly impacts the budget of our campus.

I take this opportunity to denounce again (only) the most recent events, related to the insistent effort by Professor Fernández to affect my class program for next semester:

. . . .

Since the actions of Professor Margarita Fernández Zavala, as an administrator of the UPRB, are obvious attacks on my economic, professional, and emotional stability (without forgetting that she incurs in serious violations of the civil rights that protect me), I request from you [that you] state in writing the official position of the UPRB Academic Dean's Office on the sudden cancellation of all online courses of the Department of Humanities executed today April 28, 2014 by Professor Fernández Zavala.

. . . .

Cordially,
Nieve de los Ángeles Vázquez Lazo, Ph.D.
Assistant Professor
Department of Humanities[.]

See, Docket No. 123-2.

### C. Newspaper

The April 28th letter was referred to Chancellor González-González, who failed to take action (PSUMF (Docket No. 97), ¶¶ 16-17). On May 2, 2014, local newspaper El Nuevo Día interviewed plaintiff and published an article which quoted her as stating that student online enrollment of online humanities courses was at zero because the courses were blocked, which would affect around 120 students as well as university revenues (PSUMF (Docket No. 97), ¶¶ 18,

20; DOSUMF (Docket No. 110-1), ¶¶ 18, 20; Docket No. 123-4).[8]  Plaintiff provided to El Nuevo

Día a copy of the April 28th letter (PSUMF (Docket No 97), ¶ 18; DOSUMF (Docket No. 110-1),

¶ 20).[9]  That same day, at a Humanities Department meeting, Prof. Fernández-Zavala confronted

plaintiff with the newspaper article, saying that discussing university affairs with the press was

improper and against "university styles" (PSUMF (Docket No. 97), ¶ 23; DOSUMF (Docket No.

110-1), ¶ 23).[10]

### D.  Meeting/Recommendations

On May 14, 2014, Dr. Rosario, met with Dr. Gelpí, Prof. Ferrer, Prof. Fernández, Dr.

Pabón, and Dr. Francisco J. García (PSUMF (Docket No. 97), ¶ 25; DOSUMF (Docket No. 110-

1), ¶ 25).  At some point, Dr. Pabón and Dr. García left the meeting, and in their absence, Dr.

Rosario, Dr. Gelpí and Prof. Ferrer discussed plaintiff's probationary appointment.[11]  That same

---

[8] Plaintiff states that in her experience, or at least between September 2010 and April 2014, online enrollment for the online humanities courses was never blocked during admissions.  See, "Plaintiff's Statement of Additional Uncontested Material Facts" ("PSAUMF") (Docket No. 121-1, ¶ 49).  She relies on her own affidavit at Docket No. 121-30.  Defendants oppose, stating that the courses were normally blocked and that students had to visit the relevant department and talk to officials in order to enroll in online courses.  See, "Defendants' Opposition to Plaintiff's Additional Statement of Uncontested Material Facts at Docket No. 121" ("DOSAUMF") (Docket No. 125-1, ¶ 49).  For support, defendants refer to an affidavit from Chancellor González-González (Docket Nos. 125-7, ¶¶ 7-8).  These two competing affidavits create a genuine dispute as to whether the courses were truly blocked as of the date of plaintiff's statements to the press.  It is not up to the court to make credibility determinations that correspond to the jury.  See, García-González, 761 F.3d at 99 (observing that courts cannot make credibility determinations or weigh the evidence, as these are jury functions, not those of a judge)(citation omitted).  At the end of the day, however, the dispute is immaterial to the ultimate disposition of the present case.

[9] Without citation to the record, defendants deny PSUMF (Docket No. 97), ¶¶ 18 and 20, stating that plaintiff has no personal knowledge over these matters, and that her reference to a newspaper article is "by definition, classic hearsay" (DOSUMF (Docket No. 110-1), ¶¶ 18, 20).  But plaintiff has set the foundation for her knowledge as to her statements and her delivery of the April 28, 2014 letter to the press.  See, Docket No. 97-1, ¶¶ 18, 20.  Accordingly, PSUMF (Docket No. 97), ¶¶ 18 and 20 are deemed admitted.

[10] A summons for a meeting of the Humanities Department Personnel Committee was then issued, which was ultimately scheduled for May 14, 2014, and included three topics in the agenda: (1) verification of quorum; (2) discussion of evaluation processes; and (3) new matters (PSUMF (Docket No. 97), ¶ 24; DOSUMF (Docket No. 110-1), ¶ 24).

[11] There is a genuine dispute as to what occurred during the meeting and its significance.  Plaintiff contends the meeting had officially adjourned after the three topics in the agenda were covered, and that discussion as to plaintiff's

day, in representation of the Humanities Department Personnel Committee, they issued a letter to Chancellor González-González informing him of their decision against renewing plaintiff's probationary appointment (DSUMF (Docket No. 102-1), ¶ 43; POSUMF (Docket No. 120), ¶ 43; Docket No. 131-33).[12]  In turn, the Chancellor requested these members to state the basis for their recommendation, and as to the members who did not sign the May 14, 2014 letter (to wit, Dr. Pabón and Dr. García), to state their reasons for not doing so (DSUMF (Docket No. 102-1), ¶ 43; POSUMF (Docket No. 120), ¶ 43; Docket Nos. 131-33 and 131-34).  On May 22, 2014, Dr. Rosario, Dr. Gelpí and Prof. Ferrer submitted a letter stating the basis for their recommendations, which included that plaintiff:

(1)  Requested tenure without following applicable regulations even though she was unqualified;

(2)  Attempted to prevent Committee members from evaluating her performance in the classroom;

(3)  Had not submitted a duly prepared peer evaluation;

(4)  Distributed examining officer Rosa Malavé's report on her workplace harassment complaint even though the Chancellor did not adopt it, which was considered an attempt to damage their reputation;

(5)  Attempted to hamper the appointment of an interim director of the Humanities Department by filing two motions which were later denied;

---

probationary appointment was not in the agenda (PSUMF (Docket No. 97), ¶ 26).  Defendants counter that although a motion to adjourn was presented, it was not approved, and thus the meeting was still open because: (1) quorum is satisfied with half its members plus one (i.e. majority), which was met with the number members that remained at the meeting; and (2) there were still issues left to discuss, including plaintiff's probationary appointment (DOSUMF (Docket No. 110-1), ¶ 26).

[12] Plaintiff denies this statement of fact "as drafted," but does not deny its veracity.  See, POSUMF (Docket No. 120), ¶ 43.  She simply adds that the May 14, 2014, letter was actually prepared on May 11, 2014, which evinces "the fact that the decision had been made days before the meeting."  Id.; see also, PSUMF (Docket No. 97), ¶¶ 27-28; DOSUMF (Docket No. 110-1), ¶¶ 27-28.  Defendants admit that Dr. Rosario, Dr. Gelpí and Prof. Ferrer had made their decision since May 11, 2014, but qualify that it was nonetheless backed by the committee majority (PSUMF (Docket No. 97), ¶¶ 27-28; DOSUMF (Docket No. 110-1), ¶¶ 27-28).

    (6) Provided, on May 2, 2014, information to a local newspaper without following
alternate channels; and,

    (7) Was hostile towards other colleagues, which was disruptive of the "atmosphere
of camaraderie" that existed beforehand, all of which called into question her
professionalism, commitment, equity, sensibility, and objectivity as a potential
candidate for tenure.

See, DSUMF (Docket No. 102-1), ¶¶ 46-47; POSUMF (Docket No. 120), ¶¶ 46-
47; Docket No. 131-37).[13]

Dr. García and Dr. Pabón presented letters to the Chancellor stating their reasons for not

joining their peers in opposing the renewal of plaintiff's probationary appointment (DSUMF

(Docket No. 102-1), ¶ 44-45; POSUMF (Docket No. 120), ¶¶ 44-45; PSUMF (Docket No. 97), ¶

29; DOSUMF (Docket No. 110-1), ¶ 29; Docket Nos. 131-35; 131-36). They argued that the non-

renewal recommendation was: (1) not a majority decision; (2) not in the agenda; (3) discussed

after the meeting ended, and thus without taking their opinions into account; and (4) violated

university regulations (PSUMF (Docket No. 97), ¶ 29; DOSUMF (Docket No. 110-1), ¶ 29). Both

professors endorsed the renewal of plaintiff's probationary contract. Id.

## E. **Plaintiff's Response**

    On June 2, 2014, Chancellor González-González notified plaintiff with copy of the

committee letter, providing her with the opportunity to present her position within ten days

(DSUMF (Docket No. 102-1), ¶ 48; POSUMF (Docket No. 120), ¶ 48; PSUMF (Docket No. 97),

¶ 31; DOSUMF (Docket No. 110-1), ¶ 31). On June 9, 2014, plaintiff submitted her response,

---

[13] Although plaintiff denies DSUMF (Docket No. 102-1), ¶¶ 46-47 "as drafted," she merely provides her own
characterization of the contents of the letter of May 22, 2014 (POSUMF (Docket No. 120), ¶¶46-47). Thus, the denial
is disregarded as unsupported argumentation. See, Roggio v. City of Gardner, 2013 WL 1947033, *4 (D. Mass. May
9, 2013)("As a general matter, factual statements in briefs that are made . . . with reference to evidence that is in some
way mischaracterized need not be considered at all, or may be treated as mere argument."). In any event, for purposes
of ruling on the pending motions, the contents of the May 22, 2014, letter are taken from the letter itself (Docket No.
131-37).

stating that Dr. Rosario, Dr. Gelpí and Prof. Ferrer's recommendations were: (1) false or otherwise not based on evidentiary or legal grounds; (2) made in retaliation for her exercise of her First Amendment rights; and (3) not made by the majority of the Committee (DSUMF (Docket No. 102-1), ¶ 49; POSUMF (Docket No. 120), ¶ 49; PSUMF (Docket No. 97), ¶ 32; DOSUMF (Docket No. 110-1), ¶ 32; Docket No. 131-39). She requested an administrative hearing to allow Dr. Rosario, Dr. Gelpí and Prof. Ferrer to submit a statement of charges and for the parties to present evidence and witnesses. Id.

## F. Chancellor's Decision

After evaluating Dr. Rosario, Dr. Gelpí and Prof. Ferrer's recommendations as well as Dr. García's, Dr. Pabón's, and plaintiff's response letters, on July 3, 2014, Chancellor González-González denied plaintiff's request for a hearing and terminated her probationary appointment effective January 2015 (DSUMF (Docket No. 102-1), ¶ 50; DOSUMF (Docket No. 110-1), ¶¶ 33, 50; PSUMF (Docket No. 97), ¶ 33; Docket No. 131-40, ¶¶ 1-8).[14] The Chancellor stated that non-renewal of the probationary appointment was warranted because plaintiff:

(1) Published her workplace harassment complaint to members of the Humanities Department, which promoted a sense of restlessness among the faculty and disparaged their reputations;

(2) Repeatedly refused to engage the appropriate communication channels [thereby engaging in] acts of insubordination which affected the consideration of academic proposals;

(3) On May 2, 2014, published incorrect or incomplete information to the press regarding the issues pertaining to the enrollment of online courses, which promoted confusion in the community and lacerated UPRB's reputation;

---

[14] Although plaintiff denies DSUMF (Docket No. 102-1), ¶ 50, her denial is argumentative and does not contest that (1) the July 3, 2014, letter reflects the Chancellor's decision not to renew her probationary appointment, or (2) the contents of the letter itself. See, POSUMF (Docket No. 120), ¶ 50. At any rate, for purposes of ruling on the pending motions, the contents of the July 3, 2014, letter are taken from the letter itself (Docket No. 131-40).

(4) Ignored the deadline set for submitting to the Humanities Department information required for peer evaluations of the second semester 2013-2014;

(5) Refused to return to the Department her peer reviewed evaluations;

(6) Failed to correct and complete the required qualification log for the academic semester of 2013-2014, despite being asked to do so; and

(7) Used a tone that denoted lack of consideration, tact, good sense, and decorum in her communications to UPRB officials.

Id.[15]

## G. **Appellate Review and Reinstatement**

Plaintiff appealed the Chancellor's decision to the President of the UPR, who, based on the Report and Recommendation of an Examining Officer (José L. Miranda-de Hostos), affirmed the decision on December 9, 2014 (DSUMF (Docket No. 102-1), ¶ 56; POSUMF (Docket No. 120), ¶ 56; Docket No. 131-1, p. 12).[16] Plaintiff appealed the President's decision to the UPR's Governing Board, which referred to matter to an Examining Officer (María Soledad Ramírez-Becerra), who, after reviewing the record and the parties' submissions, recommended that plaintiff be reinstated to her probationary status with back pay, and that an External Committee or Examining Officer be appointed to evaluate plaintiff for tenure (DSUMF (Docket No. 102-1), ¶ 57; POSUMF (Docket No. 120), ¶ 57; PSUMF (Docket No. 97), ¶¶ 36-37; DOSUMF (Docket No. 110-1), ¶¶ 36-37; Docket No. 131-1).[17] The Governing Board adopted the Examining Officer's

---

[15] Plaintiff submits additional statements of facts to support her theory that the reasons for termination stated in the letter of July 3, 2014, are a pretext for a retaliatory dismissal (PSAUMF (Docket No. 121-1), ¶¶ 40-48). Those statements are: (1) argumentative; (2) disputed by defendants' evidence; or (3) ask the court to weigh the evidence or assess witnesses' credibility.

[16] Plaintiff denies DSUMF (Docket No. 102-1), ¶ 56 "as drafted," but does not properly controvert that the President confirmed the Chancellor's decision. See, DOSUMF (Docket No. 110-1), ¶ 56.

[17] In support of her recommendations, the Examining Officer pointed out that the Chancellor "could not just rely on the opinions of several members of the personnel committee regarding plaintiff's character, without any supporting

recommendations. Thus, in August 2016, plaintiff was reinstated to her probationary position (PSUMF (Docket No. 97), ¶ 38; DOSUMF (Docket No. 110-1), ¶ 38). In May 2017, the External Committee issued a report recommending the renewal of plaintiff's probationary appointment, which the President endorsed (DSUMF (Docket No. 102-1), ¶ 58; POSUMF (Docket No. 120), ¶ 58; PSUMF (Docket No. 97), ¶ 39; DOSUMF (Docket No. 110-1), ¶ 39; Docket No. 131-1).[18] In April 2018, the Governing Board revoked the initial determination denying plaintiff tenure, and granted her tenure retroactively to July 2013 (PSUMF (Docket No. 97), ¶ 13; DOSUMF (Docket No. 110-1), ¶ 13; Docket No. 123-1).

## IV.    DISCUSSION

### A. Due Process

Plaintiff alleges that defendants violated the Due Process Clause of the Fourteenth Amendment (Docket No. 98). The Fourteenth Amendment prohibits state actors from depriving a person of "liberty or property without due process of law." U.S. Const. amend. XIV. It has a substantive component and a procedural component. See, DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005)(so noting). The procedural aspect ensures that government will use fair procedures. Id. The substantive aspect safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them,

---

evidence. The Chancellor should have requested said evidence and should have provided the same to plaintiff for her to respond. The Chancellor could not, as he did, ignore the evaluation of the other academic aspects established in [the General Regulations] regarding plaintiff's performance . . . . The Chancellor had to evaluate plaintiff under all the aspects and not only her professional attitude, and issue a supported decision after analyzing each one of the criteria" (PSUMF (Docket No. 97), ¶ 36; Docket No. 131-1, p. 116). The Examining Officer, however, also rejected plaintiff's allegations of discrimination and reprisal (Docket No. 131-1, pp. 117-118). The effect of this aspect of her ruling is discussed at length below.

[18] On February 15, 2018, plaintiff was granted tenure, effective July 1, 2017 (DSUMF (Docket No. 102-1), ¶¶ 58-59; DOSUMF (Docket No. 110-1), ¶¶ 58-59).

focusing on what the government has done, as opposed to how and when the government did it.

See, Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990)(describing concept).  For these purposes,

Puerto Rico is "the functional equivalent of a state."  González-Droz v. González-Colón, 660 F.3d

1, 10 (1st Cir. 2011).  After the University's initial decision not to renew plaintiff's probationary

contract, she appealed the decision within the UPR system, which reinstated her to the

probationary position and eventually granted her retroactive tenure.  This development moots

plaintiff's claim of entitlement to injunctive relief.  However, because she seeks payment of

emotional damages against the individual defendants in their personal capacities, the court turns

to the merit of this claim.  See, Skoly v. McKee, 103 F. 4th 74, 77 (1st Cir. 2024)(evaluating

plaintiff's damages claims against state officials in their individual capacities even though the

claims for declaratory and injunctive relief were considered moot).[19]

## 1. Procedural Due Process

Plaintiff claims that Dr. Rosario, Dr. Gelpí, Prof. Ferrer, and Chancellor González

González's recommendations of non-renewal of her probationary contract deprived her of rights

without due process of law because she was not given a proper opportunity to defend herself from

allegedly injurious remarks (Docket No. 98, pp. 11-14).  To state a procedural due process claim,

the plaintiff must show that: (1) she was deprived of a protected liberty or property interest, and

(2) the defendants, acting under color of state law, deprived her of that interest without

constitutionally adequate process.  See, González-Droz, 660 F.3d at 11 (articulating standard).

---

[19] The Eleventh Amendment bars monetary relief against the UPR, UPRB, the other institutional defendants as well as those sued in their official capacity but not against the individual defendants sued in their personal capacity.  See, Vaqueria Tres Monjitas v. Irizarry, 587 F. 3d 464, 477-488 (1st Cir. 2009)(recognizing that under the Eleventh Amendment state officials in their official capacities may be sued for equitable but not monetary relief).  Puerto Rico "is treated as a state" for purposes of the Eleventh Amendment.  Díaz-Fonseca v. Puerto Rico, 451 F. 3d 13, 33 (1st Cir. 2006).

Unless a plaintiff brings forth facts to show that she is demanding procedural safeguards to protect an interest recognized by the Fourteenth Amendment, "the procedural protections will never come into play." Lipp v. Board of Ed. of City of Chi., 470 F.2d 802, 804 (7th Cir. 1972). The record does not support plaintiff's claim, as she was given the opportunity to react to the Committee's recommendation to the Chancellor before he made the decision in question. Further, plaintiff had no protected property interest triggering the procedural component of the Due Process Clause.

### a. Property Interest

The Fourteenth Amendment's procedural protection of property "is a safeguard of the security interests that a person has already acquired in specific benefits." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972). In order to establish a constitutionally protected property interest in employment, a plaintiff must demonstrate that she has a legally recognized expectation that she will retain her position. See, González-De-Blasini v. Family Dept., 377 F. 3d 81, 85 (1st Cir. 2004)(so noting). Property interests are not created by the Constitution. See, Roth, 408 U.S. at 577 (explaining formulation). Rather, they are created, and their dimensions defined, by existing rules or understandings that stem from an independent source such as state law. Id.

A legitimate expectation of continued employment may derive from a statute, a contract, or an officially sanctioned rule of the workplace. See, Santana, 342 F.3d at 24 (addressing issue). That has been recognized in case of tenured professors, and in the case of employees who may only be dismissed with cause. See, Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 192 (1988)(tenured university employee); Slochower v. Bd. of Higher Educ. of City of N.Y., 350 U.S 551, 554, 559 (1956)(tenured professor); Perkins v. Bd. of Dir. Of Sch. Admin. Dist. No. 13, 686 F.2d 49, 51 (1st Cir. 1982)(removal for cause).

Probationary employment lacks those characteristics.  See, Febus-Cruz v. Sauri-Santiago, 652 F.Supp.2d 140, 151-152 (D.P.R. 2009)(examining implications of probationary period under Due Process Clause).  In their absence, probationary employees are in effect "at will" employees, lacking a property right in continued employment.  See, Gómez v. Rivera Rodríguez, 344 F.3d 103, 111 (1st Cir. 2003)("Under ordinary circumstances, an 'at-will' employee lacks a reasonable expectation of continued employment (and, thus, has no property interest in [her] job)"); LaBorde v. Franklin Par. Sch. Bd., 510 F.2d 590, 592, 593 (5th Cir. 1975)(teacher at end of probationary period does not have protectable property interest in future employment); Jeffries v. Turkey Run Consol. Sch. Dist., 492 F. 2d 1, 3 (7th Cir. 1974)(nontenured teacher lacks property interest entitling her to procedural due process if school board decides not to renew her contract).[20]  Thus, setting aside unusual circumstances, "a probationary university employee has no 'property' interest in obtaining tenure." Beitzell v. Jeffrey, 643 F.2d 870, 875 (1st Cir. 1981).

From the general to the particular, at the time of the events that plaintiff complains about, she was not tenured but at the end point of her probationary period without a legally recognized expectation to continued employment.  By extension, she lacked a constitutionally protected property interest entitling her to the protections of the Due Process Clause.  See, Roth, 408 U.S. at 564 (untenured teacher not entitled to procedural due process protection); Febus-Cruz, 652 F. Supp. 2d at 152 (dismissing procedural due process claim of employee terminated from

---

[20] See also, Ste. Marie v. City of Dayton, 87 Fed.Appx. 537, 538 (6th Cir. 2004)(probationary employee does not possess a due-process protected interest in continued employment); Ramos v. Dep't of Educ., 52 F.Supp.3d 387, 435-436 (D.P.R. 2014)(probationary employees cannot be said to have a protected property interest in their positions); Harmon v. Cumberland Cty. Bd. of Educ., 186 F.Supp.3d 500, 508-509 (E.D. N.C.), aff'd, 669 Fed.Appx. 174 (4th Cir. 2016)(probationary teacher does not have protected property interest in continued employment); Fitzgerald v. Feiberg, 1999 WL 619584, *3 (S.D. N.Y. Aug. 16, 1999)(probationary or at-will employees lack a legitimate claim of entitlement, and therefore do not have a property interest in the expectation of continued employment); Joslyn v. Kinch, 613 F.Supp.1168, 1178 (D.R.I. 1985)(employee who has completed probationary period has a property interest in his position).

employment within probationary period); Fitzgerald, 1999 WL 619584 at **3-4 (as a probationary employee, plaintiff had no property interest in position that would entitle him to due process protection and thus was not entitled to a hearing prior to demotion). Cf., Newman v. Com. of Mass., 884 F.2d 19, 23 (1st Cir. 1989)(tenured professor entitled to protections of procedural due process).

### b. **Liberty Interest**

The concept of liberty recognizes two particular interests: (1) protection of the public employee's good name, reputation, honor and integrity; and (2) the employee's freedom to take advantage of other employment opportunities. See, Roth, 408 U.S. at 573-574 (examining concept). But defamation or injury to reputation by itself is not a liberty interest protected by the procedural guarantees of the Fourteenth Amendment. See, Paul v. Davis, 424 U.S. 693, 708-709 (1976)(so holding); Mead v. Indep. Ass'n, 684 F. 3d 226, 232 (1st Cir. 2012)(due process claim cannot rest upon reputational harm alone). When a person alleges to have suffered stigmatization at the hands of a government actor, she must show an adverse effect "on some interest more tangible than reputational harm." URI Student Senate v. Town of Narragansett, 631 F.3d 1, 9 (1st Cir. 2011). To use the popular catch phrase, the complaining party must satisfy a "stigma plus" standard. Id.

On this end, plaintiff must show that defendants made a false stigmatizing public statement concerning reasons for termination which resulted in significant damage to the employee's standing in the community or foreclosed further employment opportunities. See, Ventetuolo v. Burke, 596 F.2d 476, 482-483 (1st Cir. 1979)(articulating and applying test). Generally, the requirement has been satisfied in cases in which the employer has accused the employee of dishonesty, immorality, or criminality. See, Shands v. City of Kennett, 993 F.2d 1337, 1347 (8th Cir. 1993)(so observing). The evidence does not, however, reach this critical threshold.

<u>Vázquez Lazo</u> v. <u>Walker; et al.</u>
Civil No. 15-1891 (PAD)
Opinion and Order
Page 19

From the record, the majority of committee members recommended that plaintiff's probationary appointment not be renewed because she requested tenure without following applicable regulations; attempted to prevent committee members from evaluating her classroom performance, did not submit a duly prepared peer evaluation; tried to damage the committee's reputation by distributing the examining officer's report on her workplace harassment complaint even though the Chancellor had not adopted it; sought to hamper the appointment of an interim director for the Humanities Department; provided information to a local newspapers without following alternate channels; was hostile to her colleagues, which disrupted the atmosphere of camaraderie that existed beforehand, all of which called into question her professionalism, commitment and objectivity as a potential tenure candidate.  For his part, the Chancellor concluded that plaintiff promoted a sense of restlessness among the faculty; engaged in insubordination by repeatedly refusing to use appropriate communication channels; created confusion in the community, lacerating the UPRB's reputation by publishing incorrect information; refused to return information required for peer evaluations to the Humanities Department; and did not correct and complete the required qualification log despite being asked to do so.

These grounds fall way short of a charge of "dishonesty" or "moral turpitude" that would implicate plaintiff's liberty interests.  <u>See</u>, <u>Kyles</u> v. <u>E. Neb. Hum. Serv. Agency</u>, 632 F.2d 57, 61 (8th Cir. 1980)(poor attitude, unsupported actions toward superiors, disobeying agency directives and poor relationships with others in the agency do not rise to the level of stigma required to sustain a valid procedural due process claim); <u>Hayes v. Phx.-Talent Sch. Dist. No. 4</u>, 893 F.2d 235, 237 (9th Cir. 1990)(incompetence, inability to relate well with others, and lack of tact not stigmatizing); <u>Lovelace</u> v. <u>Se. Mass. Univ.</u>, 793 F.2d 419, 424 (1st Cir. 1986)(same); <u>Ventetuolo</u>, 596 F.2d at 479, 482-484 (blatant insubordination, open hostility and complete refusal to accept the commands

of the director, and defiance of directives not tantamount to stigma foreclosing job opportunities);

Shutt v. Miller, 724 Fed.Appx. 112, 115 (3rd Cir. 2018)(depiction of plaintiff as disruptive and

unprofessional insufficient to transform a reputation interest into a liberty interest).[21]

On another level, there is no evidence that non-renewal of plaintiff's probationary contract

was accompanied by defamatory formal charges or statements that defendants disseminated to the

public or to prospective employers.  To the contrary, the evidence shows that defendants'

recommendations were made as part of an administrative process, without any indicia that they

were made public.  Without dissemination, no liberty interest is implicated, and procedural due

process is not infringed.  See, Silva v. Worden, 130 F.3d 26, 33 (1st Cir. 1997)(liberty interest not

implicated where employer terminated plaintiff's probationary contract after plaintiff pushed a

coworker and city officials did not disseminate information outside of administrative setting);

Wooten v. Clifton Forge Sch. Bd., 655 F. 2d 552, 555 (4th Cir. 1981)(no liberty interest infringed

in part because Board did not voluntarily disclosed to the public the reasons for plaintiff's

demotion and cut in pay); Hayes, 893 F.2d at 237 (liberty interest not violated in absence of

publicized charge of moral turpitude or dishonesty); Kyles, 632 F.2d at 61-62 (rejecting procedural

due process action because reasons for termination were communicated only to plaintiff and to

members of the advisory/investigatory committee which held such information in confidence);

---

[21] See also, LaBorde, 510 F.2d at 592 & n. 3 (refusal or inability to carry out direct instructions of the Principal and the Superintendent, uncooperative attitude toward the Principal, improper supervision and planning, use of language unbecoming a teacher in the classrooms, use of harsh discipline, and reporting late for beginning of school day insufficient to infringe plaintiff's liberty); Harmon, 186 F.Supp.3d at 504, 508 (inability to maintain effective management and contemptuous and insubordinate behavior not sufficiently stigmatizing to establish a deprivation of a liberty interest). Cf., Rodriguez de Quinonez v. Perez, 596 F.2d 486, 489 (1st Cir. 1979)(removal from bank director status on grounds of dishonesty, actual or suspected, affected a liberty interest requiring procedural due process safeguards).

<u>LaBorde</u>, 510 F.2d at 593 (dismissing probationary teacher's claim in part because none of the charges against her were made public by school officials).

At the same time, no rigid taxonomy exists for evaluating the adequacy of state procedures in a given case.  <u>See</u>. <u>González-Droz</u>, 660 F.3d at 11 (addressing issue).  The essentials of procedural due process comprise notice of the charges and a reasonable opportunity to meet them. <u>See</u>, <u>Amsden</u>, 904 F.2d at 753 (so stating); <u>Newman</u>, 930 F.2d at 961 ("The Constitution does not require every procedural protection that might help; it simply requires that a private person have a basically fair opportunity to convince the *decision maker* by presenting proofs and arguments and evidence and replies to the arguments of others").  And as mentioned earlier, defendants gave plaintiff notice of their recommendations and provided her with the opportunity to respond.  This, despite the lack of constitutionally protected property or liberty interests so requiring. Consequently, plaintiff's procedural due process claim cannot stand.

## 2.  <u>Substantive Due Process</u>

Plaintiff alleges that the evaluation that Dr. Rosario, Dr. Gelpí, Prof. Ferrer, and Chancellor González González's conducted of her performance was a "sham" and their determination of non-renewal arbitrary, which in her view amounts to a substantive due process violation for which she is entitled to relief (Docket No. 98, pp. 14-15).  The criteria used for identifying proscribed governmental action vary depending on whether the challenged action is legislative or executive. <u>DePoutot</u>, 424 F.3d at 118 (so recognizing)(<u>citing</u> <u>Cty. of Sacramento</u> v. <u>Lewis</u>, 523 U.S. 833, 846 (1998)).  In the realm of executive action, "arbitrariness" means actions "so extreme and egregious as to shock the contemporary conscience."  <u>Id</u>.  For that reason, to prevail on the substantive due process claim plaintiff must show that conscious-shocking conduct deprived her of a protected liberty or property interest.  <u>See</u>, <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 32 (1st Cir. 2006)(applying test).

That interest must implicate a fundamental constitutional right.  See, González-Fuentes v. Molina, 607 F.3d 864, 880 & n. 13 (1st Cir. 2010)(describing protected interests); Cabrero v. Ruiz, 826 F. Supp. 591, 598 (D.P.R. 1993)(same).[22]  To be actionable, the official conduct must be outrageous, stunning, and uncivilized, more than a humdrum legal error or bad-faith violations of state law. See, Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992)(applying concept); Pagán, 448 F.3d at 32 (similar).

Plaintiff does not satisfy these parameters.  Even if she were asserting a fundamental right, what she complains of falls short of shocking the conscience.  See, Maymí v. P.R. Ports Auth., 515 F.3d 20, 30 (1st Cir. 2008)(allegations that plaintiff was dismissed from trust position and reinstated to a career position with inferior duties and decreased salary considered insufficient to cross constitutional threshold); Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991)(plaintiff's supervisor berating plaintiff in presence of her students, ordering her in a crass and gross tone to admit a student she had turned away from her class, rendering an oral evaluation that plaintiff was not a good teacher, and repeated calls to plaintiff's coworkers defaming her and creating an uncomfortable work environment, not conscience-shocking in a substantive due process sense); Farris v. Poore, 841 F.Supp.2d 436, 441-442 (D. Me. 2012)(even if town manager had no authority to make termination decision and was a biased decisionmaker, it is insufficient to state a substantive due process claim); McCaan v. City of Lawrence, 2009 WL 10694417, *5 (D. Mass. Sept. 25, 2009)(threatening plaintiff with criminal prosecution and publicly accusing him

---

[22] See also, Wozniak v. Conry, 236 F. 3d 888, 891 (7th Cir. 2001)(rejecting university professor's substantive due process claim noting that this doctrine applies only to decisions affecting fundamental civil rights); Learnard v. Inhabitants of Town of Van Buren, 164 F. Supp. 2d 35, 41 & n. 2 (D. Me. 2001)(noting that substantive due process claims generally have something to do with matters relating to bodily integrity, procreation, marriage and family rather than property or employment)(citing Albright v. Oliver, 510 U.S. 266, 272 (1994)).

of mismanagement and insubordination do not describe conduct so brutal, demeaning and harmful that it is shocking to the conscience).[23] C.f., Bliss v. Sanguinet, 2013 WL 3334728, **1-3, 5 (D. Mass. June 24, 2013) (holding that plaintiff "barely" cleared the hurdle, notwithstanding the fact that following his promotion within the police department over another candidate, members of the Board of Selectmen targeted him by bringing false charges of misconduct due to their personal relationship with the unsuccessful candidate, going as far as granting a town resident's unrelated request for a cease-and-desist order in exchange for her agreement to concoct false allegations against the plaintiff), but in the case the evidence at bar is simply not of the same ilk.  Accordingly, the substantive due process claim fails.

## B. Retaliation: First Amendment/Law 115

### 1. General Framework

Plaintiff alleges that defendants violated the First Amendment and Law 115 by terminating her employment in retaliation for having made statements to the Press and complaining about discrimination (Docket No. 8).  The First Amendment prohibits government officials from "abridging freedom of speech."  Hous. Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 474 (2022).  The prohibition proscribes those officials from subjecting individuals to retaliatory actions for having engaged in protected speech.  Id.  State colleges and universities are bound by this proscription.

---

[23] See also, Wilson v. Moreau, 440 F.Supp.2d 81, 101 (D.R.I. 2006)(that Mayor substituted a junker for plaintiff police chief's new-model city-issued vehicle, yelled at plaintiff in front of his secretary, excluded him from police force meetings and otherwise omitted him from the chain of command, and ordered plaintiff to stop the process of applying for police department accreditation not conscience-shocking); Owens v. Jackman, 1999 WL 1995190, *2 (D. Me. Nov. 18, 1999 (termination of plaintiff's employment despite advice that such a move was illegal and thereafter refusing to rehire plaintiff on the basis of allegedly prefabricated complaints not conscious-shocking behavior); Pagán, 448 F.3d at 32-33 (exerting undue influence over bank's directors so that they would deny loan request insufficient to sustain substantive due process claim); Martineau v. Kurland, 36 F.Supp.2d 39, 45 (D. Mass. 1999)(rumor-spreading about plaintiff and scrupulous documenting of plaintiff's errors so that his employment might be terminated not conscience-shocking).

See, Hennessy v. City of Melrose, 194 F.3d 237, 245 (1st Cir. 1999)(applying First Amendment to dispute related to teacher-in-training in public university setting). They are not "enclaves immune from the sweep of the First Amendment." Healy v. James, 408 U.S. 169, 180 (1972). Thus, nonrenewal of a college professor's contract would violate the First Amendment if it were based on her protected speech "even if the professor lacked a property interest in continued employment." Cheveras-Pacheco v. Rivera-González, 809 F. 2d 125, 128 (1st Cir. 1987). Although Puerto Rico is not a state, the First Amendment applies in the archipelago as if it were a state. See, Pérez-Guzmán v. Gracia, 346 F.3d 229, 232 & n. 1 (1st Cir. 2003)(considering Puerto Rico the functional equivalent of a state for First Amendment purposes).

To account "for the complexity associated with the interplay between rights of free speech and government employment," Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 527 (2022), in the evaluation of whether an adverse employment action against a public employee violated an individual's rights under the First Amendment courts employ "a three-part inquiry." Bruce v. Worcester Reg. Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022). The first part concerns whether the public employee spoke as a citizen on a matter of public concern. Id. The second part concerns whether, if the employee did so, the relevant government entity had an adequate justification for treating the employee differently than any other member of the general public. Id. The third part concerns whether, if that government entity did not have an adequate justification, the protected expression was a substantial or motivating factor in the adverse employment decision. Id. Even then, the employer must have the opportunity to prove that at the end of the day, it would have made the same decision regardless of the protected expression. Id.[24]

---

[24] Puerto Rico has adopted "the same test federal courts use" to evaluate free speech-retaliation claims under the Puerto Rico Constitution, P.R. Const., art. II, § 4. López-Mieres v. Cruz-Soto, 2021 WL 5216932, *5 (D.P.R. Nov. 9, 2021).

Vázquez Lazo v. Walker; et al.
Civil No. 15-1891 (PAD)
Opinion and Order
Page 25

In turn, Law 115 makes it unlawful for an employer to discharge, threaten, or discriminate against an employee who has: (1) offered or attempted to offer testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico; or (2) provided or attempted to provide testimony, expression or information in internal procedures the company has established or before any employee or representative in a position of authority as long as the expression is not of a defamatory character or constitutes disclosure of privileged information established by law. See, P.R. Laws Ann. tit. 29, § 194a(a)(so providing). The second proviso was inserted in the statute by way of Law No. 169 of September 29, 2014. Prior to the enactment, "it did not enter into the retaliation calculus under Law 115." González-Santiago v. Baxter Healthcare S.A., 2021 WL 1208207, *39 (D.P.R. Mar. 29, 2021).

To set out a *prima facie* case under the statute, a plaintiff must show that she: (1) participated in an activity protected by Law 115; and (2) was subsequently discharged or otherwise discriminated against. See, Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010)(articulating test). If the plaintiff puts together this showing, the employer must provide a "legitimate," non-discriminatory reason for the challenged action. Rivera-Rodríguez v. Sears Roebuck de P.R., Inc., 367 F.Supp.2d 216, 230 (D.P.R. 2005). Should the employer do so, the plaintiff now bears the burden of demonstrating that the reason asserted for the action is a pretext for retaliation. Id.

Law 115's evidentiary framework mirrors that of McDonnell Douglass Corp. v. Green, 411 U.S. 792, 801-803 (1973), as has been applied in the evaluation of retaliation actions under

---

To this effect, see, Hernández-Estrella v. Junta de Apelaciones del Sistema de Educación Pública, 147 P.R. Dec. 840, 848-850 (1999); Barreto-Sosa v. Estado Libre Asociado de Puerto Rico, 2003 WL 23324478, **15-16 (P.R. Ct. of App. Nov. 25, 2003).

Vázquez Lazo v. Walker; et al.
Civil No. 15-1891 (PAD)
Opinion and Order
Page 26

Title VII and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq.. See, Medina-Rivera v. Medina & Medina Inc., 898 F.3d 77, 97 (1st Cir. 2018)(recognizing that Law 115 is largely symmetrical in scope and has parallel mechanisms to the anti-retaliation provisions in Title VII and the ADEA); Arroyo-Flores v. IPR Pharmaceutical, Inc., 2017 WL 944194, *19 (D.P.R. Mar. 9, 2017)(expressing that because plaintiff's ADEA retaliation claim lacked merit, the Law 115 claim lacked merit as well); Maldonado-Cátala v. Mun. of Naranjito, 255 F.Supp.3d 300, 321 (D.P.R. 2015)(observing that a Law 115 retaliation claim is conterminous with a Title VII retaliation claim).

## 2. **Res Judicata**

Res judicata bars these claims. The description of their contours is important to understand why.[25]  As for their interaction with res judicata, once again, plaintiff appealed the adverse decisions within the UPR administrative system, which reinstated her on the job; restored her to probationary status; and granted her tenure, with retroactive back pay. In the process, the Examining Officer concluded that there was no evidence tending to show reprisal, and that the record did not show plaintiff would have been evaluated through non-academic criteria regarding professional attitude which, in the judgment of those who evaluated her, was expected of a professor. Federal courts must give the findings of a state agency the same preclusive effect that those findings would be entitled to in that state's court, provided that the agency was acting in a

---

[25] On December 26, 2019, the court directed the parties to file a supplemental memorandum discussing Garcetti v. Ceballos, 547 U.S. 410 (2006) and Lane v. Franks, 573 U.S. 228 (2014), important elements of a retaliation action involving freedom of speech; the criteria relied on in cases applying those decisions; and how those criteria apply to the facts in the record here (Docket No. 160), which the parties did, on February 7, 2020 (Docket Nos. 165 and 166). On September 27, 2022, the court informed the parties that they could supplement and update their filings by October 11, 2022 (Docket No. 174). After requesting an extension to do so, the parties each filed supplemental briefs, on December 13, 2022, and December 14, 2022 (Docket Nos. 185 and 187). Because of the res judicata disposition of the free-speech related retaliation claim, it is not necessary to analyze the Garcetti-Lane angle of the claim.

judicial capacity; the questions litigated were properly before the agency; and the parties had an adequate opportunity to litigate the issue.  See, Univ. of Tenn. v. Elliot, 478 U.S. 788, 799 (1986)(recognizing principle).  All three of these requirements are present here.

The Governing Board acted on a Report issued by an Examining Officer, who reviewed the record and the parties' briefs.  The parties were given the opportunity to present their views before the Examining Officer; and the issue of retaliation was properly before her.  With these elements in place, Puerto Rico courts accord agency determinations preclusive effect to enforce repose.  See, Pagán-Hernández v. U.P.R., 7 P.R. Offic. Trans. 795, 803-804 (1978) (acknowledging the application of the res judicata doctrine in connection with administrative proceedings).  The doctrine applies to "claim preclusion" and "issue preclusion."  Baez-Cruz v. Mun. of Comerio, 140 F.3d 24, 29 (1st Cir. 1998).  For the doctrine to apply, there must be the most perfect identity between the things; causes; and persons of the litigants, and their capacity as such.  Id.

### a. **Identity of Persons**

In the state forum, plaintiff appealed the UPRB Chancellor's decision to the University's President, and the President's decision to the UPR's Governing Board including as a party the UPRB and the Administrative Board of the UPRB (Docket No. 131-1, p. 4).  In the present case, she sued the President, the UPRB Chancellor, the UPRB Dean of Students, members of the UPRB's Humanities Department Personnel Committee, and the UPR Board of Trustees (Docket No. 8).  That plaintiff sued different persons or entities as part of the instant action does not destroy the doctrine's "identity of persons" requirement.  Courts have applied res judicata "against a plaintiff who adds defendants in the second action."  Baez-Cruz, 140 F.3d at 29.

To this effect, there is identity of persons whenever "the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of prestations" (i.e. a performance of something due upon an obligation) among those having a right to demand them, or the obligation to satisfy the same. Id. at 29. That identity is required "so that a party's rights and obligations will not be determined without their knowledge or an opportunity for participation." Futura Dev. Corp. v. Centex Corp., 761 F.2d 33, 43 (1st Cir. 1985). The initial respondents and the defendants in the case sub judice are but different components of a single administrative system, that of the UPR, and in one way or another, were all implicated in the state proceeding. As such, they have sufficient identity of interest to be viewed as identical parties within the parameters of Puerto Rico preclusion law.[26]

### b. **Identity of Things**

The test for identity of things is "whether a decision in the second action may contradict the prior adjudication." Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 61 (1st Cir. 2000). The Examining Officer concluded that there was no evidence tending to show reprisal or discrimination, and the record did not show that plaintiff would have been evaluated through non-academic criteria regarding professional attitude which, in the judgment of those who evaluated her, was expected of a professor. A ruling in plaintiff's favor now obviously would contradict these determinations. Thus, res judicata applies. See, Boateng, 210 F.3d at 62 (giving res judicata effect to state forum finding that the University did not discriminate against plaintiff due to his

---

[26] Plaintiff does not question that there is identity of parties between the administrative proceeding and this case.

race, color or nationality, as a ruling in plaintiff's favor in the subsequent federal action would contradict earlier state determination).[27]

### c. Identity of Causes

Identity of cause is satisfied "where two actions flow from the same principal ground or origin." Grajales v. P.R. Ports Auth., 923 F.3d 40, 43 (1st Cir. 2019)(internal quotations omitted). Plaintiff argues that res judicata does not apply because she did not file a First Amendment claim in the appeal before the Governing Board (Docket No. 119, p. 15). However, as the Examining Officer noted in her Report, plaintiff challenged before the Board the decision to terminate the probationary contract (Docket No. 131-1, p. 64). To that end, among other things, the Examining Officer pointed out that according to plaintiff, the Chancellor erred in dismissing her in reprisal for having denounced discrimination, harassment, and breach of civil and constitutional rights against her (Docket No. 131-1, p. 64). Along the same line, plaintiff stated that the statements that she made were in the exercise of her freedom of speech, and that as a citizen, she exercised that freedom by denouncing the Humanities' Department's situation to the Press. Id. at p. 65.

Similarly, the Examining Officer observed that the Report and Recommendation on which the President acted when plaintiff appealed to him the Chancellor's decision, states that plaintiff distributed to the press privileged and confidential communications regarding internal departmental procedures regarding closing of courses on campus, without authorization from supervisors or administrative heads. Id. at 67. That Report and Recommendation also concludes that there was no evidence that plaintiff was dismissed due to discrimination or as a result of work harassment or reprisals. Id. at 68. The Examining Officer concluded that plaintiff did not present

---

[27] Like with identity of parties, plaintiff does not question that there is identity of things between the administrative proceeding and this case.

evidence tending to demonstrate that the Chancellor's decision was retaliatory or discriminatory, and the record did not show that plaintiff would have been evaluated through non-academic criteria regarding professional attitude which, in the judgment of those who evaluated her, was expected of a professor. On this account, the issue of reprisal was squarely placed before the Examining Officer.

At bottom, plaintiff's argument mistakes the legal cause of action for the factual cause contemplated by Puerto Rico's preclusion law, which "requires an identity of the latter, not the former." Boateng, 210 F.3d at 62. For that reason, a party does not have a right to bring separate suits on different legal theories arising out of a single nucleus of operative facts. Id. In those circumstances, a mere difference in the legal theories on which two causes of action are grounded "does not destroy the identity of thing or cause" that otherwise exists between those two suits. Grajales, 923 F.3d at 43. The parties and their privies are precluded from relitigating claims "that were or could have been raised in a previous suit." Boateng, 210 F.3d at 62. That being so, that plaintiff may not have expressly invoked the First Amendment –or Law 115– in the administrative proceeding, does not shield her from the effect of res judicata in this case. To illustrate, take Grajales.

There, plaintiff claimed in state court that he was dismissed from his employment in retaliation for complaining about safety issues in the workplace and/or participating in an investigation performed by Puerto Rico safety agencies. See, 923 F.3d at 44. In federal court, he claimed that the defendant violated the First Amendment. Id. at 42-43. He lost in state court, and the federal case was dismissed on res judicata grounds. Id. at 42-45. As the cases shared the same operative facts, that plaintiff put forward a different legal theory and sought a different remedy in the federal action was of no consequence. Id. Like in Grajales, the state administrative case and

the present case share a common nucleus of operative facts.  So, the result is the same: dismissal of the retaliation claims on res judicata grounds.

### C.  Sections 1981a, 1985(3), 1986 and 1988

Plaintiff asserts claims entitlement to relief under 42 U.S.C. §§ 1981a, 1985(3), 1986, and 1988 (Docket No. 8).  Section 1981a provides "an additional remedy" for unlawful intentional discrimination under Title VII.  Pollard v. Wawa Food Mkt., 366 F.Supp.2d 247, 251 (E.D. Pa. 2005).  Section 1988 "authorizes attorney's fees as part of a remedy for violations of civil rights statutes . . . ." Estes v. Tuscaloosa Cty., Ala., 696 F.2d 898, 901 (11th Cir. 1983).  Neither Section 1981a nor Section 1988 creates an independent cause of action.  See, Pollard, 366 F.Supp.2d at 251 (articulating formulation in connection with Section 1981a); Estes, 696 F.2d at 901 (similar with respect to Section 1988).  Because plaintiff cannot prevail under Title VII, the First Amendment and the Due Process Clause, dismissal of the 42 U.S.C. §§ 1981a and 1988 claims is appropriate.

As for Section 1985(3), it prohibits persons from conspiring to deprive any person or class of persons of the equal protection of the laws.  See, Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)(so noting).[28]  And Section 1986 extends liability to persons who knowingly fail to prevent Section 1985 conspiracies.  See, Rivera Sánchez v. Autoridad de Energía Eléctrica, 360 F.Supp.2d 302, 312 (D.P.R. 2005)(addressing issue).  At Docket No. 52, p. 3, plaintiff

---

[28] A claim under Section 1985(3) has four elements: (1) a conspiracy; (2) a conspiratorial purpose to deprive plaintiff of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property, or deprivation of a constitutionally protected right.  See, Soto-Padró v. Pub. Bldg. Auth., 675 F.3d 1, 4 (1st Cir. 2012)(citation omitted).  A section 1985(3) claim "requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action . . . .'" Pérez-Sánchez, 531 F.3d at 107 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

Vázquez Lazo v. Walker; et al.
Civil No. 15-1891 (PAD)
Opinion and Order
Page 32

acknowledged that she is not pursuing a conspiracy claim set in Section 1985(3). Therefore, dismissal follows as to 42 U.S.C. §§ 1985(3) and1986.

## V.    <u>CONCLUSION</u>

For the reasons stated, defendants' motion is GRANTED, plaintiff's motion DENIED, and the case DISMISSED. Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of June, 2024.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge